## KELLY v. KELLY. (No. 11642.)*

(Court of Civil Appeals of Texas. Fort Worth. Dec. 8, 1926. Rehearing Denied Jan. 15, 1927.)

1. Frauds, statute of ⟷158(1)—Burden was on party claiming that transaction was not within statute to bring himself within exception to general rule (Rev. St. 1925, arts. 1288, 3995).

Burden was on party claiming that heir had verbally given up interest in mother's estate to show that transaction was within exception to general rule under statute of frauds (Rev. St. 1925, arts. 1288, 3995), providing that conveyances of an interest in land must be evidenced by instrument in writing.

2. Evidence ⟷276 — Evidence of deceased's statements against interest, showing intention to give property to son, who had received property under father's will, held improperly excluded.

Where deceased had, in will, directed wife to convey certain property to son, evidence of deceased's statements to witness that he intended to give son property for helping him with farm *held* improperly excluded, in suit for partition of property, since declarations were in nature of declarations against interest, and corroborated son's claim that property was acquired by purchase.

3. Estoppel ⟷71—Evidence that one had stated to witness that he disclaimed interest in property held improperly admitted, where such statements were never communicated to party claiming property.

Evidence that one had stated to witness that he disclaimed interest in estate in controversy, which statements were never communicated to one claiming property, *held* improperly admitted, since estoppel proceeds upon theory that, by reason of disclaimer, one claiming property was induced to alter his position to his damage.

4. Husband and wife ⟷274(1)—Son, to whom mother had conveyed certain property in accordance with father's will, which provided that remainder should be divided among remaining children, was entitled to share in mother's community estate on her death.

Son, to whom mother had conveyed certain tract in accordance with directions in deceased

father's will, which provided that at his wife's death property remaining should be equally divided among other children, was entitled as an heir to share of mother's one-half of community estate upon her death.

**5. Estoppel ⬅118—Heir could not be estopped from claiming interest in property except upon clear evidence of facts showing estoppel.**

One who was entitled to share in mother's estate could not be estopped from claiming same except upon clear evidence that to deny one claiming property right to recover title and possession of such interest would, under circumstances, be inequitable and unjust to him.

**6. Equity ⬅66—One who seeks equity must do equity.**

One who seeks equity must do equity.

**7. Frauds, statute of ⬅129(7)—Improvements made on property held insufficient to take verbal agreement by heir to disclaim interest in property out of statute of frauds (Rev. St. 1925, arts. 1288, 3995).**

Improvements, consisting of clearing land, clearing out Johnson grass, and repairing barn and fences, made by one claiming title to entire property, *held* insufficient to take heir's verbal agreement to disclaim any interest in mother's estate out of the statute of frauds (Rev. St. 1925, arts. 1288, 3995).

Buck, J., dissenting in part.

Appeal from District Court, Parker County; F. O. McKinsey, Judge.

Suit by C. Kelly, R. E. Kelly, and others against G. W. Kelly and others, for partition, in which C. Kelly filed amended original petition against R. E. Kelly. From a judgment for C. Kelly, R. E. Kelly appeals. Reversed for further proceedings.

W. R. Hawkins, J. M. Richards, and Jim L. McCall, all of Weatherford, for appellant.

Hood & Shadle, of Weatherford, for appellee.

CONNER, C. J. G. S. Kelly and Julia Kelly were husband and wife. They had the following children: R. E. Kelly, R. L. Kelly, W. W. Kelly, J. H. Kelly, C. Kelly, G. W. Kelly, and Julia Kelly, a daughter, who married S. W. Cain, and who died leaving one child, J. T. Cain, and her husband, S. W. Cain. G. S. and Julia Kelly owned real estate consisting of 281 acres of land. G. S. Kelly died before his wife, leaving a will, which, among other things, contained the following provisions:

"Second. I give unto the hands of my beloved wife, Julia Kelly, my property, both real and personal, to fully control said property for the use of my family.

"Third. I appoint my wife, Julia Kelly, to be my executrix of this my last will and testament without bond.

"Fourth. I desire my wife, Julia Kelly, to execute when she sees proper, a deed of gift to R. E. Kelly as part of my estate sixty-eight acres (68) of land known as the N. half of 137½ acres survey as the S. M. King survey in Parker county, Texas, said land was deeded to G. S. Kelly by S. M. King and recorded in Deed Book No. 57, page 327.

"Fifth. At the death of my wife, Julia Kelly, I desire then that the property then remaining both personal and real be sold or divided equally between my six other children, viz., R. L. Kelly, J. H. Kelly, W. W. Kelly, Craven Kelly, Julia B. Kelly, and George Kelly."

G. S. Kelly died August 8, 1906, and his said will was admitted to probate on June 29, 1910. On October 29, 1907, Julia Kelly, a feme sole, conveyed by warranty deed to R. E. Kelly, the appellant in this case, the 68 acres of land mentioned in the will. R. E. Kelly has owned and claimed said land ever since, and been in possession of said land most of the time.

In 1920, Julia Kelly died intestate, thus leaving 213 acres of the community land acquired by herself and deceased husband.

This suit, as originally filed, was instituted by appellee C. Kelly and R. E. Kelly, W. W. Kelly, and J. H. Kelly, complaining of G. W. Kelly, J. T. Cain, a minor, and his father, S. W. Cain, and R. E. Kelly, seeking a partition of the 213 acres of the community land undisposed of at the date of Julia Kelly's death. In that petition it was alleged that each of the children therein named, including appellant, owned an undivided one-seventh interest. On November 9, 1925, two days before the rendition of the judgment from which this appeal has been prosecuted, C. Kelly filed his first amended original petition, in which he alleged, among other things, that he had purchased the interests of all the heirs of G. S. and Julia Kelly, except that of appellant R. E. Kelly, and of him it was complained that the 68 acres of land mentioned in the will of G. S. Kelly and conveyed to him by his mother, Julia Kelly, as above noted, constituted his part of the interest in the community estate of his father and mother, and that therefore he had no interest in the community interest of the mother; the remainder, it was alleged, in effect, had passed to the heirs other than R. E. Kelly by the provisions of the will of their father, G. S. Kelly. The special pleading upon which this contention rested is as follows:

"That immediately thereafter (to wit, after the execution of the said deed to said 68 acres of land by Julia Kelly above mentioned), the said R. E. Kelly, defendant herein, accepted the said 68 acres of land so willed and deeded by G. S. Kelly and the said Julia Kelly as all of his interest in said estate of G. S. Kelly and Julia Kelly, and which was much more than that received by any of the other heirs, and the said defendant R. E. Kelly, immediately thereafter accepted said 68 acres of land, and went into possession of same, and accepted same as his interest in said estate, and this plaintiff, C. Kelly, and the other plaintiffs and defendants,

heirs of said G. S. and Julia Kelly, agreed with the said R. E. Kelly that he should have the 68 acres of land, and that it was all he was to receive of and from said estate, and same was both in law and in truth a partition of said estate, and at once became a valid, binding, and legal obligation and contract on all parties thereto, and the defendant R. E. Kelly is now estopped from denying same, and, relying on said acceptance of the said R. E. Kelly of said 68 acres of land as his part of said estates, and relying on same being a partition of same, this plaintiff, C. Kelly, went into possession of same, and bought out some of the heirs, and relying on same he in good faith made good and valuable improvements on said lands and premises and of the value of $350, and the said defendant R. E. Kelly continued to occupy said 68 acres of land and to claim the same, and disclaim any interest in the remainder of said lands involved herein for a period of twelve or fifteen years; that the said Julia Kelly died the day of ———, 1920, and the said defendant R. E. Kelly again at the time and divers times thereafter again disclaimed any interest in said lands here involved, and refused to pay or assist in paying any part of the funeral expenses of his deceased mother, disclaiming any interest in the property herein involved, and disclaimed any interest in the property or liability of the expenses of last sickness or funeral, and asserted that he had long since received all that was coming to him, and specially disclaimed any interest in the said property, herein in question, and he is forever estopped from claiming said land or any part of same.

"Wherefore, the said plaintiff C. Kelly, having become the sole owner of said land and premises, described in the petition and answer of plaintiffs and defendants, prays the court that a decree be entered in this cause, finding and declaring this plaintiff C. Kelly the sole owner of said lands and premises, and for such other and further relief, both in law and equity as he may be entitled to," etc.

The case was submitted to a jury upon the following special issues, to wit:

"(1) After the death of the mother of the plaintiff and defendant herein, was it stated by the defendant R. E. Kelly that he had no further claim or interest in the 213 acres of land in controversy and the personal property belonging to his mother at her death, and was it understood and agreed by and between the defendant and his brothers and sisters that he did not have and was not asserting any interest or claim in or to said property?

"(2) If you have answered issue No. 1 in the negative, you need not answer any of the following issues; but, if you have answered same in the affirmative, then answer: Did the brothers and sister of the defendant then rely upon said disclaimer of the defendant, if you have found that he did disclaim any interest in said property?

"(3) If you have answered issues Nos. 1 and 2 in the affirmative, then answer: Did the brothers and sister of the defendant after such disclaimer by the defendant, if you have found that he did disclaim any interest in said property, in good faith believe that they were the sole owners of said property, including the 213 acres of land in controversy?

"(4) If you have answered in response to issue No. 3 that the brothers and sister of the defendant believed that they were the sole owners of said property, then, in pursuance of such belief, if they did so believe, did they or either of them place permanent and valuable improvements upon said 213 acres of land in controversy?"

All issues were answered by the jury in the affirmative, and on such answers the court rendered its judgment, dismissing from the suit all parties save appellant and appellee, and decreeing that appellee, C. Kelly, recover from the defendant R. E. Kelly "the full title and possession" of the lands in controversy, for which he was awarded a writ of possession. From this judgment R. E. Kelly has duly prosecuted this appeal.

It is apparent from the agreed facts that appellant, upon the death of his mother, was invested under our laws of descent and distribution with an undivided one-seventh interest in his mother's community interest in the land in controversy, which fact was at all times well known and recognized by his brothers and other heirs, including appellant. It further appears from the undisputed facts that the sole ground upon which appellee bases his right to divest his brother of such inherited interest and title is that his brother is estopped to assert such title because he disclaimed the same, after which he (appellee) went into possession and made valuable improvements.

[1] The plea presents an exception to the rule prescribed by our statute (Rev. Statutes of 1925, art. 1288), and article 3995, relating to the conveyance of an interest in land. These statutes specifically provide that conveyances of an interest in land must be evidenced by instruments in writing. Hence the burden was upon appellee to bring himself strictly within the exception to the general rule. See Allen v. Allen, 101 Tex. 362, 107 S. W. 528. That was a case in which there was a parol agreement between the husband and wife after the purchase by the husband of land under which the wife paid the note given by the husband out of her separate property, in consideration that the lands should be hers. It was held that the agreement, coupled with the fact that she had paid the purchase money out of her separate means, did not create a resulting trust in the wife's favor and invest her with separate title to the lands. See Keith v. Keith, 39 Tex. Civ. App. 363, 87 S. W. 384; Polk v. Kyser, 21 Tex. Civ. App. 676, 53 S. W. 87, where it is held that a verbal sale of land is void unless the vendee takes possession of the same and makes valuable and permanent improvements.

In West v. Webster, 39 Tex. Civ. App. 272, 87 S. W. 196, it was held that mere possession without improvements is not sufficient to avoid the statutes.

In Dixon v. McNeese (Tex. Civ. App.) 152 S. W. 675, it was held that the mere payment of the purchase price, unaccompanied by possession, is unavailing to pass title. Nor will a mere gift of a father to a son of itself take the transaction out of the statutes. See Murphy v. Stell, 43 Tex. 123.

In Lechenger v. Merchants' National Bank (Tex. Civ. App.) 96 S. W. 638, writ denied, Judge Gill, lamented Chief Justice of the Galveston Court of Civil Appeals, said:

"The wisdom of interposing in any case to suspend the application of the statute has been always gravely questioned, and courts of equity everywhere have justified their assumption of power on the ground that they ought not to permit the statute to work a worse fraud than it was designed to prevent."

In the opinion just quoted, Judge Gill reviews many authorities and distinguishes the Texas cases from the more liberal rule of the English courts, and declined to extend the rule beyond the Texas cases.

In Cobb v. Johnson, 101 Tex. 440, 108 S. W. 811, Judge Brown held, quoting from the headnote, that:

"Improvements of an insignificant character will not serve to take a verbal contract for sale of land out of the statute of frauds. The building of a chicken coop of value of from $5 to $15, by a purchaser of property by parol sale at $1,100, did not amount to such permanent and valuable improvement as would entitle him to claim specific performance."

The case of Ann Berta Lodge No. 42, I. O. O. F., v. Leverton, 42 Tex. 18, is another case in which the doctrine is reviewed at length. It is held, in effect, that a parol agreement for the sale of land would not be enforced, even though there was a tender of purchase money and the making of improvements by the vendee; it not appearing that the vendee expended more than the rents received by him.

In Wooldridge v. Hancock, 70 Tex. 18, 6 S. W. 818, it is said:

"But it is necessary to the validity of a parol sale or gift of land in Texas, however the rule may be elsewhere, that possession be delivered and substantial and valuable improvements made, with the consent or knowledge of the vendor, upon the faith of such gift or sale; and that the mere taking possession or making improvements of insignificant value is not sufficient, especially where the value of the rents exceeds that of the improvements"—citing Ann Berta Lodge No. 42, I. O. O. F., v. Leverton, 42 Tex. 18; Eason v. Eason, 61 Tex. 227.

In Hooks v. Bridgewater, 111 Tex. 122, 229 S. W. 1114, 15 A. L. R. 216, Chief Justice Phillips said, quoting from the headnote:

"To constitute a right in equity to enforce a parol agreement for conveyance of real estate, it is necessary: (1) That the consideration be performed; (2) that possession be delivered to the promisee; (3) that he make valuable and permanent improvements upon the land with the consent of the vendor. Unless all these conditions are met the statute of frauds applies and the agreement is not enforceable."

In another case, by the same able judge, it was said, quoting from the headnotes:

"Though a contract for exchange of lands was in writing and signed by the defendant against whom specific enforcement thereof was sought, if it was not signed by plaintiff it was, by reason of the statute of frauds, not enforceable against him, and was therefore a unilateral contract of defendant by which he was not bound." Clegg v. Brannan, 111 Tex. 367, 234 S. W. 1076.

In this connection it is to be observed that there is no evidence to the effect that appellant delivered possession to appellee. Appellee was merely a joint tenant with appellant, and as such might lawfully enter into possession, and the proof shows that he did so without objection on the part of any of his cotenants. There is no evidence to the effect that appellant knew of the improvements claimed by appellee.

In Bynum v. Preston, 69 Tex. 287, 6 S. W. 428, 5 Am. St. Rep. 49, our Supreme Court stated the essential elements of an estoppel as follows:

" '1. There must have been a false representation or concealment of material facts. 2. The representation must have been made with a knowledge of the facts. 3. The party to whom it was made must have been ignorant of the truth of the matter. 4. It must have been made with the intention that the other party should act upon it. And 5. The other party must have been induced to act upon it.' Bigelow on Estoppel, 484. See, also, Steed v. Petty, 65 Tex. 490; Blum v. Merchant, 58 Tex. 400."

See, also, Burleson v. Burleson, 28 Tex. 383; Wortham v. Thompson, 81 Tex. 348, 16 S. W. 1059; Steed v. Petty, 65 Tex. 490; Nims v. Sherman, 43 Mich. 45, 4 N. W. 434.

In the case last cited it appears that the defendant claimed title to certain lands through the purchaser at a foreclosure sale, and he testified that before purchasing he went to the plaintiff in error, then in possession, and asked him in regard to his claim, and that he then made no claim of title adverse to that supposed to have been transferred by the foreclosure proceedings, and the finding of the jury was to the effect that he also agreed orally to surrender the possession. It was held that, as he was then the owner "subject to mortgage," his oral agreement to surrender possession was not binding, and he was not estopped from questioning the title of defendant in error in proceedings to recover the possession.

Relating to the subject under discussion, R. L. Kelly testified:

"My mother had probated the will. A short time after that I had a conversation with Rube, my brother. After father died I had been at home. I was down on a visit, and we all talked

it over there, and he agreed that was all he was going to get. As to the 68 acres at the time he made that, I don't know whether he knowed just how much he was going to get. He just got his part, the 68 acres, and that was all the estate he had. We all made, myself and brothers, an agreement about his part of the estate. Rube just said this 68 acres was his part of the estate; that is just what he said he would accept it. He had no more to do with the estate. After mother died I was down at the place; we met there; Rube came. We met there to divide the land; and we all met there and found the doctor's bill and funeral expenses; and so I said to Rube: 'Will you bear part of the expenses?' He said: 'No, sir; I will not. I have got nothing to do with it. I have got my part and that is all.' That is the words he said to me. He did not help pay the funeral expenses, and gave that as his reasons. Rube said he had his 68 acres."

Mrs. Robert Kelly testified:

"I was present when Rube Kelly made a statement about any interest he had or did not have in the property. My husband, R. L. Kelly, asked Rube if he would help pay the expenses, and he said, 'No; I have my part and I think that lets me out.' They were talking about the funeral expenses of the old lady."

Plaintiff C. Kelly testified:

"After father's death, and after Rube went on the 68 acres, he just said that was his part of the estate of all the estate. After mother died the other brothers and I met, not at my house, but at George's and Rube came there too. He came to have a settlement of a horse, mother had given him half a horse, and he wanted to get a settlement of the horse; the rest were there to see about the funeral expenses. After Rube came there, Bob asked him if he would pay part of the funeral expenses, and he said, 'No, sir;' he would not; he did not have any interest down there; that he had done got his part. He said he had his part; 'the rest belongs to you boys; you all settle it among yourselves.'"

It is evident that the statements attributed to appellant by the testimony just quoted, to the effect that the 68 acres was his part of the estate, were made before his mother's death, and related to the community interest of the father and not to that of the mother, in whom none of the children then had an interest. In other words, we think the truth of allegations in plaintiff's petition, to the effect that there was a parol agreement of partition between R. E. Kelly and the other heirs of their mother's community interest in the land in controversy, by the terms of which R. E. Kelly was to receive the 68 acres devised to him by his father in full settlement of his interest in his mother's estate, and the other heirs were to receive the remainder of such estate, was refuted by the uncontradicted testimony of the other heirs, which was introduced by plaintiff himself. According to that testimony, when the statements attributed to R. E. Kelly, to the effect that the 68 acres was his full share of the estate, was made,

he had already received a deed to that tract, that he had received it before his mother's death, and that none of his brothers or sister questioned his title thereto. Therefore, such testimony, if true, amounted to nothing more than proof of a parol agreement by R. E. Kelly that he would relinquish to his brothers and sister his undivided one-seventh interest in his mother's community half of the land in controversy, which would be an undivided one-fourteenth interest in the whole. To this may be added that the issue of a parol partition was neither submitted or requested, thus leaving as the sole issues to be determined the issue of waiver and of improvements of a character sufficient to bar appellant's right by way of an estoppel.

Appellant challenges the sufficiency of the evidence to sustain the jury's finding of improvements in good faith, but before reviewing the evidence we will refer to some of the cases discussing the kind of improvements necessary to take the case of a parol gift or sale of land out of the statutes when the other requisites are present. In Eason v. Eason, 61 Tex. 225, Chief Justice Willie said:

"In the case of Ann Berta Lodge v. Leverton, 42 Tex. 25, Judge Moore, speaking of a purchase under a verbal contract for land, says it cannot be 'maintained that any character of improvements or repairs made on the premises, of however little value, will entitle the purchaser to have the contract enforced.' And further, on page 26, that 'it is well settled when the purchaser * * * has gained more by his possession than he has expended in improvements, they will not avail him as a ground for specific execution.'"

In Baldwin v. Riley (Tex. Civ. App.) 108 S. W. 1192, it is said to be well settled in this state that to take a parol gift of land out of the statute of frauds, possession of the land must be taken by the donee, and improvements of some substantial value, having relation to the value of the land, be made by him with the acquiescence and during the lifetime of the donor, citing numerous cases in support of that proposition. And it was also held that a donee of 50 acres of land did with the donor's assistance a little clearing on the edge of the timber on the land where he wanted to build a house was insufficient to take the gift out of the statute of frauds; no valuable or permanent improvements being made by the donee during the donor's lifetime.

In Hutcheson v. Chandler, 47 Tex. Civ. App. 124, 104 S. W. 434, it was held that a person who claimed a parol gift of two city lots, which were fenced at the time of the alleged gift, afterwards fixed the fence, and planted three or four fig trees and a few rosebushes, amounting in value to less than $10, and of no material benefit to the property, would not take the case out of the operation of the statute.

In Wallis v. Turner (Tex. Civ. App.) 95 S.

W. 61, the evidence showed that the donee did some work on a fence on the land, the value of the work not being shown, and that the donee furnished about a dozen posts to repair the fence, the value of the posts not being shown, and it was held that the improvements made were not of a character as to take the parol gift out of the operation of the statute of frauds.

The character of improvements relied on by appellee was thus stated by him:

"I accepted Rube's statement that the 68 acres he had got was all the interest he had in it; I accepted that in good faith, and made improvements on the place on the faith of his statement. I cleared some land down there, about 10 acres. I would figure it was worth about $5 an acre to clear that land; and I cleared out the Johnson grass on the place. It was pretty near solid Johnson grass; poisoned with Johnson grass. I think it was a man's job to clear it. In real bad Johnson grass there was something like 25 acres of it that was pretty near solid Johnson grass. Getting Johnson grass off the land and keeping it off I think would very nearly double, or more than that, the value of the land for farming purposes. It is nearly impossible to raise row crops on land well seeded with that stuff. Where it is solid, it is impossible. On that 25 acres of course there is some Johnson grass yet, but nothing to compare with what it was when I went there. I have done a great deal of work on it. As to the value of the work I did on that 25 acres, if you just take it in what it would be worth, it is very good, smooth land, I couldn't hardly compare what it would be. It cost lots of money to get the Johnson grass out. I believe the value of the work and expense on the 25 acres would be $200 or $300. I believe it would be worth as much as $5 an acre to clear it out. In the way of improvements I also put some sheet iron on the barn. I disremember what that cost. It was something right around $20. I did the work myself. Getting it out, everything, and putting it on, I think would be worth something like $4 or $5 or $6. I also fixed the fences, kept the fences up, and such as that. I did that in good faith under the agreement, relying on Rube's statement that he had got all that was coming to him. I took possession and did all that work relying on his statements about it.

"As to the difference in the value of that property, without the improvements, before I did that work, and with the improvements, I would figure that there is more than $1,000 difference in the place now, and when I went there. I did the work, or had it done, that has been put there. That is the way I figure it, if I was taking charge of the place like it is now, or going back when I first went there, I would make $1,000 difference in buying the place."

Appellant denied that he had ever disclaimed his interest in his mother's estate; and there was other evidence to the effect that on the death of the mother there was a controversy about the payment of her funeral expenses, and that appellant had declined to bear any part of this expense, on the ground that appellee, who had taken charge of the farm and personal property, valued at some $300 or more, had enough in his possession to pay said expenses; and there was other evidence to the effect that appellee had assumed to pay all such expenses in consideration of a promise of the heirs, other than appellant, that appellee should occupy and cultivate the farm for two years free of rent. There was other evidence to the effect that he in fact occupied and cultivated the farm free of rent for some five years prior to the institution of the suit.

Appellant, among other things, offered the evidence of O. L. Naker, to the effect that he (Naker) was well acquainted with G. S. Kelly, the father of plaintiff and defendant; that G. S. Kelly died some 18 years ago; that a year or two prior to his death the witness met G. S. Kelly at a point named, and that G. S. Kelly at that time and place stated that he and his wife owned the land in controversy in this suit, some 283 acres; that while talking with G. S. Kelly about his affairs, he (G. S. Kelly) told the witness that his sons were leaving the place, but that R. E. Kelly, appellant, "was going to stay with him and work on the place and help him pay it out, and, if he did, in consideration of his so doing, he (G. S. Kelly) was going to give R. E. Kelly a part of the place."

[2] Upon the tender of this testimony, the plaintiff objected, for the reason that such a conversation was had during the lifetime of G. S. Kelly and before his death, at which time he left a will and willed R. E. Kelly 68 acres of land, and that the testimony was immaterial and inadmissible to prove the foregoing facts. The objection was sustained by the court, and the evidence excluded, to which ruling appellant duly excepted and reserved a proper bill of exception. In this we think the court erred. By a reading of the will it is apparent that G. S. Kelly was intending to dispose of his estate, and that he intended that appellant should have out of that estate the land as in the will specified, and the inference is plain from the terms of the will that the execution of the deed to the said land by appellant's mother was pursuant to the direction of her husband's will and the trust reposed in her by her deceased husband to do so. It will be noted, on consideration of the will, that the real and personal property of the testator was devised to the wife "for the use" of his family, and that she, as executrix of the will, was authorized and directed to execute the deed to appellant as she did. And there was evidence in behalf of appellant, that seems not to have been disputed, that all of the adult children of G. S. and Julia Kelly, except appellant, abandoned the home, and that he (appellant) remained with his father and in fact helped his father to pay off an indebtedness of some $2,000 due on the place. We think the declarations of G. S. Kelly to

the witness Naker were in the nature of declarations against interest, served to explain an ambiguity of the will and to corroborate appellant's claim that the 68 acres he had received under the deed of his mother was acquired in the way of a purchase and not by advancement or inheritance. If such were found to be the facts, there could be no merit in appellee's contention that appellant had already received all and more than his inheritable share in his mother's and father's estate. The fact that the father in his will devised the rest of his estate, other than the 68 acres, to the rest of his children, excluding appellant, tends to show that the father intended that appellant, after having received said 68 acres, should not further participate in his part of the community property.

[3] Appellant also assigns error to the introduction of the evidence of several witnesses to which he objected, to the effect that he had stated to them that he disclaimed any interest in the estate in controversy. To this evidence objection was made in behalf of appellant that such statements were never communicated to appellee and therefore could not constitute a proper basis of estoppel, and we think this objection well taken. The principle of estoppel proceeds upon the theory that, by reason of the disclaimer, appellee was induced to alter his position to his damage, and it is manifest that statements which were never communicated to him, could in no way influence his action. The statements were not offered to impeach appellant in the way of contradicting his denials of the disclaimers imputed to him, and hence should have been excluded.

[4-6] For the errors indicated, we think the judgment must be reversed, and, in view of another trial, we think it proper to observe that the record undoubtedly shows that upon the death of the mother appellant was entitled as an heir to recover one-seventh of her one-half of the community estate, and that this title cannot be divested out of him, nor he estopped from claiming the same except upon clear evidence that to now deny appellee the right to recover title and possession of such interest would under the circumstances be inequitable and unjust to him. It is a familiar principle of equity that he who seeks equity must do equity, and we suggest that equity between the parties may be done perhaps by applying the rules applicable to the rights of joint tenants. Appellee undoubtedly knew of appellant's right, and nothing in the record suggests to us why, in a partition, the lands improved by him, if in fact valuable and permanent, may not be awarded to him in partition and he thus receive the full benefit of such improvements, or, if in a partition such cannot be done, then perhaps justice may be awarded appellee by requiring contribution on the part of appellant. We think it is to be well doubted whether the improvements shown in the case

before us are such as to take the case out of the statute, even though all other requirements be shown. It is to be noted that the appellee shows himself to be entitled under the will of his father and by purchase from the other devisees named in that will to the community estate of the father less the 68 acres in effect devised to appellant. Appellant asserts no claim to any part of his father's estate; his only claim being to a one-seventh part of his mother's community interest of approximately 140 acres. It therefore would seem to be apparent that appellant was not benefited by, and should not be chargeable with, the improvements, if any, upon that part of the whole tract of land in controversy which was devised to appellee and the other heirs, to the exclusion of appellant, and in the remainder it would seem that appellant would be chargeable in equity with only one-seventh part of such improvements as related to the mother's community interest. The evidence fails to show upon what part of the lands in controversy the improvements were made. There was testimony on the part of appellant to the effect that, while in possession of the farm he planted Johnson grass as a crop and found it profitable. Appellee, it seems, preferred crops other than Johnson grass, and hence plowed it up. The proof further shows, as hereinbefore stated, that appellee had remained in possession of the premises for some five years after the death of his mother, and that he assumed the payment of the debts and his mother's funeral expenses in consideration of being permitted to occupy the premises for two years, after which he further occupied it rent free for three years. ·

[7] Under such circumstances, the majority at least are of the opinion that the improvements relied upon are not such as to take the case out of the statute. If the majority are correct in this conclusion, it must follow, we think, that appellant should be vested with full title and right to possession of the one-seventh undivided part in his mother's community estate, and that the equities of the parties, as already indicated, should be settled in accordance with the rules applied to the subject in cases of partition. Some of the cases already cited indicate such rules, and Mr. Story (14th Ed.) vol. 2, p. 265, § 887, in illustrating the subject, declares that:

"So where one tenant in common, supposing himself to be legally entitled to the whole premises, has erected valuable buildings thereon, he will be entitled to an equitable partition of the premises, so as to give him the benefit of his improvements; or, if that cannot be done, he will be entitled to a compensation for those improvements."

This subject will not be elaborated, in view of the fact that this theory of the case was not suggested below nor here, nor do we feel quite prepared to say that the evidence is

such as to enable us to properly determine the equities.

For the reasons indicated, it is ordered that the judgment below be reversed for further proceedings not inconsistent with this opinion.

BUCK, J. (dissenting). I have not found myself prepared to agree with the conclusion of the majority that appellant was not estopped from claiming any interest in his mother's estate, under the facts shown in the record. I think it was a question of fact as to whether, upon the death of Mrs. Kelly, the mother, that R. E. Kelly had it in mind to waive all claims against his mother's estate, and, he having asserted that he did waive such claim, he could not thereafter, if valuable and permanent improvements had been made on the land in reliance upon such waiver, assert any interest in the estate. Certainly he alone knew whether he waived his interest in the mother's estate, and the other heirs, including appellee, were ignorant of his state of mind on this question, except as indicated by his statement. The statement, in effect, that he waived any interest that he had in his mother's estate, was evidently made with the intent that his brothers and sister should act upon such waiver. He refused to pay any part of his mother's funeral expenses, and the other heirs, and especially appellee, did pay all of such expenses. Therefore, I think the facts in this case meet all the requirements of an estoppel set out in Bynum v. Preston, 69 Tex. 287, 6 S. W. 428, 5 Am. St. Rep. 49.

2 Bouv. Law Dict. 1176, defines a "fact" as: "An action; a thing done. A circumstance." A "circumstance" is defined by the Standard Dictionary as: "Something existing or occurring incidentally to some other fact or event; a related or concurrent act or thing; * * * an event, happening, or fact." I am of the opinion that the state of the mind of appellant, at the time he refused to pay any part of his mother's funeral expenses, and at the time he stated that he had gotten already all of his interest in the estate, was a fact, and that his false statement as to such fact constituted the initial ground of an estoppel.

I am further of the opinion that the finding of the jury that the brothers and sister of appellant, or either of them, in good faith, and in reliance on the waiver or disclaimer of appellant of any interest in the mother's estate, thereafter placed permanent and valuable improvements upon said 213 acres of land, is supported by the evidence, as quoted in the majority opinion.

The evidence further shows that appellee paid the remainder of the indebtedness of the estate, after the sale of the personal property and the application of the proceeds thereon, to such debts, including most of the funeral expenses. Appellant paid nothing.

2 Bouv. Law Dict. 1517, defines "improvement" as:

"An amelioration in the condition of real or personal property affected by the expenditure of labor or money for the purpose of rendering it useful for other purposes than those for which it was originally used, or more useful for the same purposes. It includes repairs or addition to buildings, and the erection of fences, barns," etc.

The writer thinks that the plowing up of Johnson grass, and the destruction thereof, on a farm, constitutes "a permanent and valuable improvement" to the land. It is a matter of common knowledge that farmers owning farms upon which Johnson grass has gained a strong foothold oftentimes pay $5 an acre or more to have the land cleared of the pest; also give from one to three years' use of the land for such purpose. That the Johnson grass once removed constitutes a permanent and valuable improvement placed on the land cannot, in the opinion of the writer, be questioned, even if the covering of the barn with sheet iron at a cost of $20, excluding the value of the labor, be not considered. The writer thinks the admission of the testimony of certain witnesses, to the effect that appellant had on various occasions told them that he disclaimed any interest in the estate of his mother, and had no interest therein, was probably admissible as an admission against interest, even though such statements were not communicated to the appellee or to any of the other children of Mrs. Kelly. Appellant denied on the trial that he had made the statement after his mother's death that he did not claim any part in his mother's estate. See Ellis v. Stone, 4 Civ. App. 157, 23 S. W. 405; Mixon v. Miles (Tex. Civ. App.) 46 S. W. 105, affirmed in 92 Tex. 318, 47 S. W. 966; Shannon v. Marchbanks, 35 Tex. Civ. App. 615, 80 S. W. 860, and numerous other decisions.

Owing to the pressure of other official duties, the writer contents himself with these reasons for his dissent from the conclusion of the majority.